UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHERI L. WEIDNER,             :        Case No. 1:08-cv-643
                                :
        Plaintiff,            :        Judge Michael R. Barrett
                                :        Magistrate Judge Timothy S. Black
vs.                          :
                                :
COMMISSIONER OF        :
SOCIAL SECURITY,       :
                                :
        Defendant.        :

**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore unentitled to supplemental security income ("SSI") and disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 16-34) (ALJ's decision)).

**I.**

On March 11, 2004, Plaintiff filed an application for SSI and DIB alleging that she became disabled on July 1, 2003, due to limited intelligence, mood disorder, schizophrenia, depression, PTSD, and problems with her left ankle, knees, and back. (Tr. 16).

_____

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

Upon denial of her claims on the state agency level, she requested a hearing *de novo* before an ALJ. (Tr. 16). A hearing was held on March 6, 2007, at which Plaintiff appeared with counsel and testified. (Tr. 484). A vocational expert, Mark Fay, was also present and testified. (*Id.*)

On January 14, 2008, the ALJ entered his decision finding Plaintiff not disabled because she could perform a significant number of jobs in the national economy. (Tr. 24-34). That decision became the final determination upon denial of review by the Appeals Council. (Tr. 7).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant met the insured status requirements of the Social Security Act through June 20, 2004. She testified that she works part-time at a Kentucky Fried Chicken restaurant. The earnings record shows only very minimal earnings for 2006 and nothing for 2007 so it is unclear if she still works or whether she worked enough to extend her date last insured. However, as of January 2008 the DISCO Insured Status Report still showed June 30, 2004 as the date last insured.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following "severe" impairments: history of polysubstance abuse in alleged remission; mood disorder; borderline intellectual functioning; residuals of bilateral arthroscopic knee surgeries; obesity; and (since September 2005) residuals of left ankle surgery; (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.929).

5.  <u>Residual functional capacity</u>.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: lift up to 50 pounds occasionally and 25 pounds frequently; she is limited to inside work in a temperature-controlled, clean-air environment; unskilled, simple tasks; no extended periods of concentration; and she is limited to low-stress jobs that are not fast paced, have no above average pressure for production, no more than occasional dealing with the public, and no more than minimal contacts with supervisors and coworkers, including no teamwork.  Therefore, she is limited to a reduced range of medium work.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was twenty years old at the alleged onset date and she is now 25 and for all dates relevant to this decision is considered to be a "younger individual" (20 CFR 404.1563 and 416.963).

8.  The claimant has a "limited" education (9th to 11th grade per various reports) and she is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from July 1, 2003, the alleged disability onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-34).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to SSI or DIB. (Tr. 34).

On appeal, Plaintiff argues that: (1) the ALJ erred in the weight he afforded to the doctors and psychologists; (2) the ALJ erred when he failed to note her borderline intelligence; (3) the ALJ erred when he relied on erroneous factors to determine her credibility; and (4) the ALJ erred when he did not include all of her limitations in the hypothetical questions he asked the vocational expert. (Doc. 6 at 4-8). Each argument will be addressed in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion. The substantial evidence
> standard presupposes that there is a "zone of choice" within

> which the Commissioner may proceed without interference
> from the courts.  If the Commissioner's decision is supported
> by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

For her first assignment of error, Plaintiff maintains that the ALJ erred in weighing the doctor's opinions.

The record reflects that:

Plaintiff did not submit any medical records from any time prior to 2004, even though her alleged onset date was July 2003.  (Tr. 16).

In January 2004, Plaintiff's parents took her to the emergency room after she reported wanting to harm herself.  (Tr. 215, 220).  She reported blackouts; burning herself with cigarettes; suicidal ideation; feeling sad, depressed and frustrated; and having conversations with people who are not there.  (Tr. 216).  She also said that she got mad at people and felt like she wanted to kill them, or make them go away.  (*Id.*)

Plaintiff was homeless, in trouble for fraud, and had just been released from jail for

writing bad checks. (Tr. 215, 222). She said that she used alcohol and got drunk regularly, as well as experimented with marijuana, cocaine, and crystal meth. (Tr. 220, 222). On discharge four days after admission, Dr. Mitchell diagnosed her with mood disorder, adjustment disorder, and post traumatic stress disorder. (Tr. 220). He prescribed medication and told her to follow up with counseling. (Tr. 221).

Plaintiff saw counselor Bain in February 2004. (Tr. 340). Plaintiff reported blackouts, feeling like people were against her, having conversations with the wall, and three other personalities. (Tr. 333, 339). Counselor Bain diagnosed Plaintiff with bipolar disorder with psychotic features, and assigned her a Global Assessment of Functioning ("GAF")[2] score of 50.[3] (Tr. 340). In March, May, and June 2004, counselor Bain reported improvement and progress. (Tr. 319, 321-24, 329-331).

Plaintiff also saw psychiatrist Dr. Freeland on three occasions from March to July 2004. (Tr. 317-18, 320, 325-28). She diagnosed Plaintiff with schizoaffective disorder and prescribed medication. (Tr. 328). Dr. Freeland felt that out of twenty work-related activities, Plaintiff was extremely limited in three, markedly limited in nine, moderately limited in two, and not significantly limited in the remaining six. (Tr. 449). She cited her

---

[2]    The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33-34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

[3]    A GAF score of 41-50 indicates serious symptoms such as suicidal ideation or suggests serious impairment in social, occupational, or school functioning. *See* DSM-IV-TR 33-34.

diagnosis of schizoaffective disorder and Plaintiff's history of hearing voices, angry outbursts, depression, anxiety, and memory impairment. (Tr. 450).

In May 2004, family medicine specialist Dr. Johnson diagnosed Plaintiff with bipolar disorder with psychotic episodes and schizophrenia, each with a history of eight years, as well as learning disabilities, but also diagnosed "possible schizophrenia" on the same report. (Tr. 451). She further opined that Plaintiff had "problems with working secondary to psychiatric problems" but did not elaborate. (Tr. 452).

Psychologist Dr. O'Donnell examined Plaintiff in connection with her DIB and SSI applications in September 2004. (Tr. 243). Upon testing and an interview, she concluded that Plaintiff had moderate impairments in her ability to relate to others, such that she would have "significant difficulty" relating to coworkers and supervisors, and did not "appear appropriate for dealing with the public." (Tr. 250). She felt that Plaintiff's ability to understand, remember and follow instructions was "slightly impaired," even though she also wrote that Plaintiff "had little or no difficulty understanding, remembering and following instructions." (*Id.*) Dr. O'Donnell attributed Plaintiff's slight limitations partly to her "personality style," and concluded that she could complete "simple tasks in a structured and supportive environment." (*Id.*) Dr. O'Donnell further opined that Plaintiff's ability to maintain attention and concentration appeared to wane over the course of testing, but that her abilities were above-average and her pace was appropriate. (Tr. 250) She also thought that Plaintiff had moderate impairments in her

ability to withstand the stress and pressure of daily work, and she attributed this in large part to the "emotional limitations" that Plaintiff alleged.  (*Id.*)

Dr. O'Donnell diagnosed Plaintiff with substance induced mood disorder; personality disorder; and borderline intellectual functioning, and assigned Plaintiff a GAF of 65.[4]  (Tr. 250).  She reported that Plaintiff achieved full scale I.Q., verbal and performance scores of 70, 71, and 75, respectively, but noted that her effort was only fair, that Plaintiff was "bored" during the process, and that there was a 95% chance that Plaintiff would obtain a valid full scale score between 65-75 on future tests.  (Tr. 247-49).  Dr. O'Donnell also wrote that Plaintiff's adaptive functioning appeared to be in the "low average range," but noted that Plaintiff "has been capable of maintaining significant relationships, adapt to new environments and carry out daily activities without difficulty."  (Tr. 249-50).  She also described Plaintiff as "street smart" and with the "common sense reasoning ability to live independently" (Tr. 247), and noted that Plaintiff reported being socially active, including going shopping, going to clubs, and visiting friends (Tr. 244).

During the interview, Plaintiff reported that she had been in special education and had made failing grades throughout her academic career but attended school through the eleventh grade.  (Tr. 244).  Plaintiff also stated that she had no interest in getting a job or vocational training.  (Tr. 246).  Dr. O'Donnell noted that Plaintiff lied about having never

---

[4]    A GAF score of 61-70 indicates some mild symptoms like depressed mood or mild insomnia or some difficulty in social, occupational or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships.  *See* DSM-IV-TR 33-34.

been homeless (*Id.*) and about her drug use at the time of her hospitalization in early 2004 (Tr. 245). In addition, she also misled Dr. O'Donnell about her arrest history. (Tr. 244). While Plaintiff claimed to have a second personality named Danielle and to suffer from extreme mood swings, Dr. O'Donnell found no evidence of either. (Tr. 249).

In September 2004, state agency psychologist Dr. Gaffey assessed Plaintiff's work-related mental abilities, and his opinions were affirmed in March 2005 by Dr. Richardson, another state agency psychologist. (Tr. 300, 314). They opined that Plaintiff did not meet a Listing, and concluded that she had moderate limitations in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. (Tr. 300, 310). They also reported that she had suffered one or two episodes of decompensation of extended duration. (Tr. 310). Both psychologists felt that Plaintiff had borderline intellectual functioning, and that she had the ability to do 1-2-3 step work instructions; maintain superficial relationships with coworkers and supervisors but probably not the public; do parallel but not cooperative work; and would be best served with verbal instructions or hands-on training as opposed to written instructions.
(Tr. 314).

Psychologist Dr. Swift evaluated Plaintiff's work-related mental capabilities in October 2004. (Tr. 454-55). Dr. Swift reported that she had seen Plaintiff once for a clinical interview/mental status exam as well as brief psychological testing. (Tr. 455). Dr. Swift wrote that: (a) "Ms. Weidner reported that she has struggled with mood swings

since age 13;" (b) "she was reportedly diagnosed with schizoaffective disorder, bipolar type;" (c) "she described blackouts;" (d) "Ms. Weidner reported that she has heard voices since age 13;" (e) "she reported frequent suicidal ideation;" (f) "she reported significant problems with reading comprehension and math and reported difficulties in work environments with learning new tasks and becoming easily confused;" and (g) "Ms. Weidner reported significant symptoms of mental illness that are currently debilitating." (*Id*.) Dr. Swift opined that, of twenty work-related mental abilities, Plaintiff was extremely limited in one, markedly limited in four, moderately limited in eleven, and not significantly limited in four. (Tr. 454).

Plaintiff presented to the emergency room in November 2004 after taking ibuprofen and Vicodin because she was angry with her mother, but she denied being suicidal. (Tr. 252). She reported frustration in obtaining access to psychiatric medication, and reported that she had been attending counseling until her Medicaid lapsed. (Tr. 252, 256). After three hours and a social services consult, she was discharged with a diagnosis of intentional overdose, bipolar disorder, and situational anger. (Tr. 253).

Plaintiff saw counselor Wilhoit in February 2005. (Tr. 377-86). She admitted that she had been non-compliant with her medication just prior to her hospital admission in November 2004. (Tr. 377). She reported crying frequently, feeling worthless and helpless, instability, being easily irritated, black outs, blowing up verbally and mood swings, as well as hearing voices when she was off her medication. (Tr. 377, 380). She also stated that she played computer games, went to church occasionally, did household

chores, and spent time with her family and fiancé. (Tr. 378). Plaintiff said that she often

had to have her parents explain things to her so that she could understand. (Tr. 379).

Counselor Wilhoit diagnosed her with bipolar disorder, severe with psychotic features,

and polysubstance dependence, in sustained full remission, and also assigned her a GAF

of 55.[5] (Tr. 385).

Plaintiff saw Dr. Whitaker in October 2005. (Tr. 375-76). She reported that she

was still rude to people and was easily irritated, but that things had been going okay, that

her memory was okay, and that she had not been seeing or hearing things. (Tr. 375).

Dr. Whitaker diagnosed Plaintiff with bipolar disorder with psychotic features, learning

disability, tobacco dependence, polysubstance abuse in remission, and borderline

personality disorder. (*Id*.)

Plaintiff saw Dr. Bishop on five occasions from November 2005 to November

2006. (Tr. 370-74, 471). In November 2005, he indicated that she was doing well on

lithium, and that she was restarting seroquel after reverting back to "her difficult

behavior" after having stopped the medication. (Tr. 374). In January, March, and July

2006, Dr. Bishop reported that Plaintiff was doing well. (Tr. 370, 372-73). In November

2006, he again reported that she was doing well and working productively. (Tr. 471).

Plaintiff said that she thought she was disabled because she was bipolar,

schizophrenic, had a split personality, and "bl[e]w up at people a lot." (Tr. 488). She

---

[5] A GAF score of 51-60 indicates moderate symptoms such as flat affect and circumstantial speech, or suggests moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR 33-34.

testified that she could not handle dealing with people on a regular basis, she had a lot of "blowouts" at work and that she cried after work every day because of the stress. (Tr. 488-89). She said that what she meant by having a split personality was that she could not remember conversations she had engaged in with others, and could not remember having written some of the poems that she had composed. (Tr. 498-99). Plaintiff said she had not discussed this with any doctor. (Tr. 499). She said that she could not stand to be around people and that when she blew up at people, she was verbally hurtful to them. (Tr. 499, 501).

Plaintiff said that she saw Dr. Bishop every other month, but was not in therapy. (Tr. 489-90). She said that she was on medication but reported no side effects. (Tr. 493). Plaintiff stated that she groomed herself, cooked, washed the dishes, made her bed, and went grocery shopping, but did not go out for meals or to the movies, did not exercise, and her only hobby was writing. (Tr. 495). She said that she did not have any friends because she had alienated them all, and that she had problems with her coworkers, including crying, becoming angry, and shouting and yelling. (Tr. 499-500). She had yelled at a customer once, which led to her yelling at her boss. (Tr. 500). Plaintiff said that she stopped abusing substances when she was 21 years old. (Tr. 496-97).

Plaintiff claims that the ALJ should have given controlling weight to Dr. Freeland's March 2004 opinion. *See* 20 C.F.R. § 404.1527(d)(2) (treating source opinion given controlling weight only if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988) (ALJ may

reject determinations of treating physician as long as he articulates good reasons for doing so). Additionally, Plaintiff complains that the ALJ did not give good reasons for rejecting Dr. Freeland's opinion, and that her conclusions were supported by Dr. Swift and Dr. Freeland's treatment records.

Despite Plaintiff's claims, the ALJ explained in some detail why he rejected Dr. Freeland's opinion. First, the ALJ correctly noted that Plaintiff saw Dr. Freeland only three times from March to July 2004. (Tr. 28). This is not the kind of treatment relationship contemplated by the regulations, which credit medical sources who have the benefit of long-term perspectives on a claimant's condition. *See* 20 C.F.R. § 404.1527(d)(2) ("we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments"); *see also Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir.2004) (lack of longitudinal view removes justification for giving treating physician's opinion special significance). Moreover, Dr. Freeland's opinions were documented on the first day she saw Plaintiff - while she documented very little information in the subsequent two visits. (Tr. 28, 317). Again, this diminishes the persuasiveness of Dr. Freeland's opinion, as the ALJ correctly determined. (Tr. 28-29). *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (rationale of the treating physician doctrine does not apply where doctor examined claimant only once).

Additionally, the ALJ found that Dr. Freeland's opinion was not well-supported because his notes were sparse and did not set forth any objective observation of

limitations; instead, Dr. Freeland appears to have simply accepted Plaintiff's allegations of mood swings and hearing voices. (Tr. 28). *See* 20 C.F.R. § 404.1527(d)(3); *McCoy ex rel. McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995) (ALJ reasonably discounted physician's opinion where claimant's subjective complaints unsupported by objective findings). Moreover, the ALJ stated that the other evidence in the record failed to support the extreme limitations suggested by Dr. Freeland. He noted the absence of any treatment prior to January 2004, the little treatment sought by Plaintiff since then, and the conservative nature of the treatment received (Tr. 29), in addition to Plaintiff's daily activities (Tr. 29-30), and her substance abuse history and its temporal relationship to her lack of objectively documented symptoms (Tr. 30).

Plaintiff also argues in support of Dr. Swift's opinion, which she describes as consistent with Dr. Freeland's opinion, and which she claims was entitled to significant weight. However, Plaintiff does not address the ALJ's analysis of Dr. Swift's opinion. She ignores the ALJ's observation that Dr. Swift saw Plaintiff only once, and even then, her written assessment only parroted Plaintiff's symptoms. (Tr. 29, 455). This kind of report is neither independently worthy of great weight nor supportive of Dr. Freeland's opinion. *See* 20 C.F.R. § 404.1527(d)(3) (opinions given less weight if not supported by clinical findings); *McCoy*, 81 F.3d at 47 (ALJ reasonably discounted physician's opinion where Plaintiff's subjective complaints unsupported by objective findings).

Accordingly, there is substantial evidence in the record supporting the ALJ's decision to reject the opinions of Dr. Freeland and Dr. Swift. The ALJ's clearly

articulated reasoning for rejecting the doctors opinions is supported by substantial

evidence.

## B.

For her next assignment of error, Plaintiff claims that the ALJ erred because he

failed to consider Listing 12.05(C). Plaintiff argues that the ALJ should have found her

to be mentally retarded (and thus disabled under Listing 12.05(C)):

> 12.05 Mental Retardation: Mental retardation refers to
> significantly subaverage general intellectual functioning with
> deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22. The required
> level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied . . . C. A valid
> verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional
> and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. In order to meet Listing 12.05(C), a claimant

must prove that she: (a) suffers from significantly subaverage general intellectual

functioning and has deficits in adaptive functioning which first manifested before she was

22 years old; (b) has a valid verbal, performance, or full scale IQ of 60 through 70; and

(c) suffers from a physical or other mental impairment imposing an additional and

significant work-related limitation of function. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1

§ 12.00(A) (must satisfy the diagnostic description in the introductory paragraph and the

criteria in subparagraph C); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001)

(claimant must show more than qualifying I.Q. score and an additional limitation).

Plaintiff contends that her I.Q. score along with her other severe impairments are

sufficient. However, while Plaintiff may have met those elements, she does not present any evidence of significantly subaverage general intellectual functioning with deficits in adaptive functioning and thus fails to allege the diagnostic criteria that is essential to any argument for disability under the listing. *See West v. Comm'r Soc. Sec.*, 240 Fed. Appx. 692, 695 (6th Cir. 2007) (no proof of deficiencies in adaptive functioning where doctors did not diagnose with mental retardation); *Newland v. Apel*, No. 97-4339, 1999 U.S. App. LEXIS 13988, at *6 (6th Cir. June 17, 1999) (diagnosis of borderline intellectual functioning not sufficient); *Hunt v. Comm'r of Soc. Sec.*, No. 06-15524, 2008 U.S. Dist. LEXIS 39785, at *5 (E.D. Mich. May 16, 2008) (no medical proof of mental retardation where no such diagnosis ever made); *Maynard v. Astrue*, No. 07-15-JMH, 2008 U.S. Dist. LEXIS 1381, at *9 (E.D. Ky. Jan. 8, 2008) (diagnoses of severe mood disorder and borderline intellectual functioning did not satisfy listing).

In fact, the only doctor who made any full evaluation of Plaintiff's intellectual abilities, Dr. O'Donnell, concluded that Plaintiff had borderline intellectual functioning even after considering her full scale I.Q. score of 70. (Tr. 27). Plaintiff also ignores the fact that Dr. O'Donnell suspected a poor effort (Tr. 27, 247) and that, as the ALJ indicated, Plaintiff had higher scores in high school, which also suggested a lack of validity as to the 2004 scores (Tr. 24, 87). In addition, Dr. O'Donnell also stated that Plaintiff's adaptive functioning was in the "low average range," noted that Plaintiff "has been capable of maintaining significant relationships, adapt to new environments and carry out daily activities without difficulty," and noted that Plaintiff reported being

socially active, including going shopping, going to clubs and visiting friends.  (Tr. 244, 249-50).  In particular, Dr. O'Donnell considered that Plaintiff was "street smart" and had the "common sense reasoning ability to live independently."  (Tr. 27, 247).  *See Burrell v. Comm'r of Soc. Sec.*, No. 99-4070, 2000 U.S. App. LEXIS 33161, at *2 (6th Cir. Dec. 8, 2000) (no evidence of deficit in adaptive functioning given claimant's behavior).

Moreover, the ALJ pointed out that Dr. O'Donnell's other conclusions about Plaintiff's overall limitations and her GAF score refute any conclusion that Plaintiff was mentally retarded.  Finally, the state agency psychiatrists gave expert evidence asserting that Plaintiff did not meet the Listing for mental retardation.  (Tr. 300).  Social Security Ruling (SSR) 96-6p explains that the completion of a Psychiatric Technique Review Form by a state agency psychologist amounts to expert evidence.  Accordingly, substantial evidence supports the ALJ finding that Plaintiff did not meet Listing 12.05(c).

## C.

For her third assignment of error, Plaintiff maintains that the ALJ erred when he found Plaintiff was not credible.

Social Security Ruling 96-7p(2) provides in relevant part:

> "When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effect of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities.  This requires the adjudicator to make a finding about the credibility of the individual's ability to do basic work activities.  This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."

SSR 96-7p(4) states in relevant part that: "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."

Moreover, it is within the discretion of the ALJ, who actually meets with and takes testimony from an individual plaintiff, to evaluate that plaintiff's credibility. As the Sixth Circuit has found: "[i]t is for the [Commissioner], not a reviewing court, to make credibility findings." *Felisky*, 35 F.3d at 1036; *see also McGuire v. Comm'r of Soc. Sec.*, No. 98-1502, 1999 WL 196508, at *6 (6th Cir. Mar. 25, 1999) (*per curiam*) ("An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility.").

As noted above, the issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). The ALJ properly evaluated Plaintiff's allegations in accordance with controlling law, and he reasonably concluded that they were not fully credible. The ALJ's credibility finding is entitled to deference and thus should be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity,

which we do not, of observing a witness's demeanor while testifying.").

A significant component of the ALJ's decision centered on the facts that: (a) Plaintiff reported that she was schizophrenic, heard voices and had a split personality, but no doctor ever documented objective findings consistent with this; (b) Plaintiff had a history of significant polysubstance abuse, and she improved after she reported ceasing this abuse; (b) the evidence showed a lack of long-term, significant or in-depth mental health care; (c) Plaintiff admitted that she was not interested in getting a job; (d) Plaintiff performed significant activities of daily living; and (e) Plaintiff possessed an arrest history for theft and fraud. (Tr. 29-32).

These facts reasonably indicated to the ALJ that while Plaintiff had some limitations as a result of her mental impairments, she was not as limited as she claimed. Accordingly, the ALJ accepted and accounted for only those alleged limitations that were supported by the medical record.

As reflected in his decision, the ALJ found mild limitations in her activities of daily living, and referenced not only her statements to Dr. O'Donnell and Dr. Bishop, but also her reported hobby of writing poetry, her relationship with her fiancé, her substance abuse and work history, and her reported daily activities, all of which was undercut with her allegations of disabling mental impairment. (Tr. 29-30). Similarly, the ALJ reviewed the entire record in concluding that Plaintiff had moderate limitations in social functioning. He referenced her documented behavior with the treating and examining

sources, as well as her testimony and drug history. (Tr. 30). Accordingly, the ALJ restricted her from more than occasional interaction with the public and more than minimal contact with co-workers and supervisors, including a ban on teamwork. (*Id.*)

Finally, the ALJ found that the evidence supported a finding that Plaintiff had a moderate limitation in her ability to maintain concentration, persistence or pace, and thus limited her to simple, unskilled work with no extended periods of concentration, as well as to low stress and not-fast-paced work. (Tr. 24, 30).

Plaintiff complains that the ALJ did not comport with the regulations, that he relied upon "erroneous factors," and makes a number of arguments that either misapprehend the decision or ignore the facts. Additionally, Plaintiff accuses the ALJ of discrediting her testimony based on her substance abuse, which, as shown above, is an incorrect interpretation of his analysis. She also argues a non-documented link between her mental impairment and her arrest history and suggests that the ALJ did not consider her "strong medications" or hospitalizations, despite the fact that the ALJ explicitly addressed those facts in his decision. (Tr. 30-31).

Accordingly, there is substantial evidence in the record supporting the ALJ's finding that Plaintiff's complaints were not credible. The ALJ clearly articulated his reasoning for the weight assigned to Plaintiffs allegations, and the undersigned finds that the ALJ's decision to give little weight to Plaintiff's complaints is supported by substantial evidence.

**D.**

For her final assignment of error, Plaintiff maintains that the ALJ erred when he gave the vocational expert ("VE") an improper hypothetical.

Plaintiff's arguments about the ALJ's hypotheticals to the VE are analogous to her arguments that the ALJ erred in determining Plaintiff's RFC. Specifically, Plaintiff argues that the hypothetical questions that the ALJ asked the VE were flawed because they did not include the limitations that she believes the ALJ similarly omitted from his RFC finding.

As explained in Section IIA, the substantial evidence supports the ALJ's RFC determination and therefore the ALJ's questioning of the VE was proper.

**III.**

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner, that Plaintiff was not entitled to supplemental security income and disability income benefits, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

Date:  November 10, 2009           s/ Timothy S. Black
                                   Timothy S. Black
                                   United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHERI L. WEIDNER,          :       Case No. 1:08-cv-643
                                  :
      Plaintiff,          :       Judge Michael R. Barrett
                                    :       Magistrate Judge Timothy S. Black
vs.                         :
                                    :
COMMISSIONER OF        :
SOCIAL SECURITY,        :
                                    :
      Defendant.       :

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **10 DAYS** after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to **13 DAYS** (excluding intervening Saturdays, Sundays, and legal holidays) when this Report is being served by mail and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **10 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 (1985).